1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-FILED: 02.09.10**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARINA VARDANOVA ARAMYAN, an individual, ANI ARAMYAN, an individual, and ENESSA ARAMYAN, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CASE NO. CV 08-00360 MMM (CWx) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

On January 18, 2008, plaintiffs Marina, Ani and Enessa Aramyan filed this action against the United States of America, Dr. John Hoh, Asian Pacific Health Care Venture, Inc. ("APHV") and Healthnet of California. On April 25, 2008, the United States of America was substituted as defendant for Dr. Hoh and APHV pursuant to 28 U.S.C. § 2679(d)(2). Plaintiffs filed an amended complaint on May 12, 2008. On December 11, 2008, the claims against Healthnet were dismissed pursuant to the parties' stipulation.

Plaintiffs' remaining claim for medical malpractice against the United States was tried to the court on July 28, 29 and 30, 2009. Having considered the evidence, the arguments of counsel, and the relevant law, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I.  FINDINGS OF FACT

## A.      The Aramyan Family

1.   The plaintiffs in this action are Marina, Ani and Enessa Aramyan, the survivors and heirs of Arthur Aramyan, who passed away on January 19, 2006.  Marina and Arthur were married in Baku, Azerbaijan.  They had two children, Ani, who is now 23, and Enessa, who is now 20.  In 2001, Mrs. Aramyan moved to the United States; the rest of the family followed in 2002.  Mrs. Aramyan explained that the family moved to avoid discrimination against people of Armenian descent in Azerbaijan.[1]

2.   Mrs. Aramyan trained as a surgical technician in the United States, and has worked as a surgical technician for five years.  Mr. Aramyan struggled to learn English and was less successful adapting to life in the United States and finding work.  In Azerbaijan, Mr. Aramyan trained as a veterinarian and earned a living as a photographer.  Although he was able to make some money working at a delivery business in the United States, Mrs. Aramyan's employment was the family's primary source of income.[2]

## B.      Asian Pacific Health Care Venture

3.   Asian Pacific Health Care Venture ("APHV") is a federal community health care center located in the Los Feliz neighborhood of Los Angeles; it primarily serves the working poor.   Seventy-five percent of APHV's patients do not have insurance; 85% are monolingual non-English speakers.  Although APHV's patients are primarily Asian, 15% are Hispanic.  In 2006, APHV had approximately 9,000 patients.  It employed seven physicians and four nurse practitioners, and had 90-100 employees overall.[3]

4.   Dr. John Hoh is APHV's medical director.  He graduated from medical school at Temple University in 1983, and completed his internship and residency at Montefiore Medical Center between 1983 to 1986. In 1986, Dr. Hoh began a three year fellowship in geriatric

---

[1]Reporter's Transcript of Proceedings ("RT") at 27-30.

[2]*Id.* at 30-33.

[3]*Id.* at 373-75, 393.

medicine. After holding various positions in the geriatric medicine field, he became the medical director of APHV. Dr. Hoh is board certified in internal medicine.[4] As APHV's medical director, approximately 30% of Dr. Hoh's time is dedicated to administration and program design; 60-70% of his time is dedicated to direct primary care.[5]

5.    APHV is a member of an Independent Physician Association ("IPA") known as Health Care L.A. ("HCLA" or the "IPA").[6] IPAs function as intermediaries between health care providers and Health Model Organizations ("HMO's").[7] HMOs pay IPAs a set amount per patient assigned to the IPA per month; the IPAs use these funds to pay different doctors within the IPA to provide care for the patients.[8]

6.    Within an IPA, a patient's primary care physician is responsible for maintaining a database regarding the patient's medical history, identifying a patient's problems, and determining what treatments and tests should be performed.[9] The primary care physician is frequently referred to as the "gatekeeper."[10] Consistent with this, HCLA's procedures require that a patient who wants to see a specialist must first see a primary care physician for a referral.[11] Patients can only be referred to specialists who have contracted with the IPA.[12] The HMOs with which APHV works require that referral forms for specialists be signed by a patient's primary care physician; primary care providers are expected to see patients

---

[4]*Id.* at 371-72.

[5]*Id.* at 375, 392.

[6]*Id.* at 331, 378.

[7]*Id.* at 222.

[8]*Id.* at 87.

[9]*Id.* at 223-24.

[10]*Id.* at 223.

[11]*Id.* at 332.

[12]*Id.* at 379-82.

1    before making referrals and to provide documentation justifying the referral.[13]

2    7.    Presently, there are about 300 HCLA patients assigned to APHV as the primary care

3          physician; of these, approximately one-third have never scheduled appointments to visit

4          APHV.[14]

5          **C.    Mr. Aramyan's Health Problems and Prescription for CABG Surgery**

6    8.    Mr. Aramyan suffered from heart-related problems for several years prior to his death.

7          In 1997, he had a heart attack.  Following the heart attack, an angiogram revealed that Mr.

8          Aramyan's right coronary artery[15] was closing off.  As a result, in 1998, doctors placed

9          a stent in the artery.[16]  Subsequently, Mr. Aramyan developed severe multi-vessel coronary

10         artery disease.  He had a history of hypertension,[17] and at the time of the events relevant

11         to this case, also had significant atherosclerosis.[18]

12   9.    Mr. Aramyan smoked one pack of cigarettes a day for more than twenty years.  He had

13         begun an effort to quit smoking at the time of his death, however.[19]

14   10.   In 2005, Mr. Aramyan began to experience chest pain.[20]  At the time, he had health

15         insurance coverage through Medi-Cal.  His primary care physician was Dr. Hakop

16

17   _____

18   [13]*Id.* at 380.

19   [14]*Id.* at 378-79.

20   [15]The coronary arteries deliver blood to the two ventricles comprising the heart.  (*Id.* at
21   227.)

22   [16]*Id.* at 33, 226.  A stent is a metal device approximately a centimeter long which holds
23   the artery open in order to permit blood to flow.  (*Id.* at 226.)

24   [17]*Id.* at 226-28.

25   [18]*Id.* at 226.  Atherosclerosis is the buildup of lipid and scar tissue in blood vessels, which
26   results in coronary artery disease.

27   [19]*Id.* at 310.

28   [20]*Id.* at 53.

1    Gevorkyan .[21]

2    11.    Dr. Gevorkyan referred Mr. Aramyan to Dr. Mesropyan, a cardiologist.  Dr. Mesropyan

3    performed various tests in August 2005.[22]  On December 9, 2005, Mr. Aramyan had an

4    angiogram at Glendale Adventist Medical Center.

5    12.    The angiogram indicated an ejection fraction of 24%.[23]  An ejection fraction is a measure

6    of the ability of the left ventricle to pump blood to the body.  A normal ejection fraction

7    is 55-70%;[24] this means that the left ventricle is able push 55-70% of the blood out of the

8    ventricle.[25]  The angiogram also indicated considerable ischemia, or lack of blood flow to

9    the heart.[26]

10    13.    After the angiogram, Dr. Nucho, a cardiothoracic surgeon, concluded that Mr. Aramyan

11    had coronary artery disease, and that he required coronary artery bypass graft, or

12    "CABG," surgery.[27]  The physicians at Glendale Hospital recommended that Mr. Aramyan

13    remain in the hospital and undergo the surgery immediately.[28]  Mr. Aramyan left the

14    hospital, however, after signing a form that stated he was leaving against medical advice.[29]

15    14.    During CABG surgery, veins are removed from a patient's legs and used to bypass blocked

16

17

---

18    [21]*Id.* at 33.

19    [22]*Id.* at 53.

20

21    [23]*Id.* at 228.

22    [24]Dr. Noble testified that 55-60% was normal; Dr. Yokoyama said that 60-70% was
     normal.  RT at 228; *id.* at 150.)

23

24    [25]*Id.* at 228.

25    [26]*Id.* at 244, 292.

26    [27]*Id.* at 34-37.

27    [28]*Id.* at 54.

28    [29]*Id.* at 55, Exh. 6.

arteries.[30]  The surgeon opens the patient's chest and obtains a vein from the patient's leg, using a special scope and making a small incision.  This vein, known as a saphenous vein, is used to bypass the blocked coronary arteries.[31]

**D.    Mr. Aramyan's Selection of Dr. Yokoyama and Change of Medical Group**

15.    On December 12, 2005, the Aramyans consulted Dr. Andros, a general surgeon recommended by a family friend, for a second opinion.  Dr. Andros concurred that Mr. Aramyan's condition required CABG surgery, and arranged an appointment with Dr. Taro Yokoyama, a cardiothoracic surgeon with the Pacific Cardiothoracic Surgery Group.[32]

16.    Dr. Yokoyama is board certified in general surgery and thoracic surgery.[33]  He practices for the most part at St. Vincent's Medical Center and St. Joseph's Medical Center.[34]  He has been in practice for approximately thirty years and performs about 250 heart operations a year.[35]

17.    On December 14, 2005, Dr. Yokoyama saw Mr. Aramyan at his office for a consultation.  Mrs. Aramyan's brother, Gary Azoyan, accompanied Mr. Aramyan to the appointment to translate from English to Armenian.[36]  Dr. Yokoyama told Mr. Aramyan and Mr. Azoyan that he believed surgery was necessary.[37]  He said the need for surgery was not urgent, but that it should be performed as soon as possible.[38]

---

[30]*Id.* at 229.

[31]*Id.* at 151.

[32]*Id.* at 38-39.

[33]*Id.* at 147.

[34]*Id.*

[35]*Id.* at 147-48.

[36]*Id.* at 156, Exh. 41 at 46.

[37]*Id.* at 188.

[38]*Id.* at 199.

6

18. After the meeting with Dr. Yokoyama, Mr. Aramyan expressed confidence in the physician's abilities and decided that Dr. Yokoyama should perform the surgery.[39]

19. Dr. Yokoyama's notes indicate he contemplated that the surgery, if approved, would be performed on December 19 or 26, 2005.[40]  This was not possible, however, as Dr. Yokoyama was not a member of Mr. Aramyan's medical group.  In order for Dr. Yokoyama to perform the surgery, Mr. Aramyan had to change medical groups.  Mrs. Aramyan's sister-in-law, Alisa Azoyan, arranged for Mr. Aramyan to switch to a group that would permit Dr. Yokoyama to perform the surgery.[41]

20. The change in groups became effective January 1, 2006; APHV was assigned as Mr. Aramyan's primary care provider.[42]

21. On January 5, 2006, Dr. Yokoyama's office faxed a request for authorization for the CABG surgery to the IPA.[43]  Normally, the IPA requires that a new patient be seen by the primary care physician to establish a relationship before it authorizes treatment by a specialist.[44]  For reasons not clarified at trial, the IPA in this case approved the surgery on January 6, despite the fact that Mr. Aramyan had not been seen at APHV.[45]  The IPA authorized the surgery to be performed at St. Vincent's Medical Center, rather than St. Joseph's, as originally contemplated by Dr. Yokoyama.[46]

22. At some point, Dr. Yokoyama selected January 19, 2006 as the date for the surgery; Mrs.

---

[39]*Id.* at 39-40

[40]*Id.*

[41]*Id.*

[42]*Id.* at 43

[43]*Id.* at 93; Exh. 41 at 28.

[44]*Id.* at 94, 107.

[45]Exh. 41 at 26.

[46]*Id.* at 96-97.

Yokoyama informed Mrs. Aramyan that this was the earliest date available, and Mrs. Aramyan agreed that the surgery could be performed on that date.[47]   There was no testimony regarding the precise date on which January 19 was selected as the day for surgery.  Mrs. Azoyan testified that she called Dr. Yokoyama's office in early January to find out when the surgery would be scheduled, suggesting that a date had not been selected at that time.[48]   Mrs. Yokoyama testified that the surgery was scheduled for January 19 after Dr. Yokoyama received the IPA's authorization to perform the surgery on January 9, 2006.  Although she did not provide a specific date, Mrs. Yokoyama suggested that the January 19 date was set shortly after January 9, 2006.[49]

**E.     Requirements Prior to Surgery**

23.   In addition to obtaining the IPA's authorization for surgery, several other things had to occur before Mr. Aramyan could undergo the CABG procedure.

24.   First, a variety of pre-operative laboratory tests had to be performed.  These included vein mapping, a chest x-ray, an EKG, a complete blood count, a biomedical profile, typing and cross-matching, and procedures known as PTT and pro-time.[50]

25.   Vein mapping is required pre-operatively to determine whether the veins in a patient's leg are of sufficient diameter that they can be used in CABG surgery.[51]   The procedure is typically performed by a technician in a diagnostic laboratory several days before

---

[47]*Id.* at 41.

[48]*Id.* at 185.

[49]*Id.* at 110 ("Q.   On or around – after you received authorization for the surgery, was surgery scheduled in fact for Mr. Aramyan near the 19th of January, 2006? A.  Yes, it was. Q. So that would be another procedural requirement that was completed.  A. Correct.  Q. So as of about this time, January 6, 2006, two procedural requirements had been completed.  A. Correct").

[50]*Id.* at 107-08.  The court lists the names of the procedures mentioned at trial here.  The nature and purpose of every procedure was not fully explained by the evidence.

[51]*Id.* at 104.

8

1    surgery,[52] although it can be done in the hospital on the day of the surgery.[53]

2    26.   PTT and pro-time are coagulation profiles used to determine whether a patient has a

3          tendency to bleed longer than normal, necessitating certain medications.[54]

4    27.   Like vein mapping, blood tests, chest x-rays, and EKG's are typically performed a few

5          days before surgery.[55]

6    28.   On January 13, 2006, Dr. Yokoyama's office ordered the preoperative testing that needed

7          to be performed prior to Mr. Aramyan's surgery on January 19.[56]

8    29.   By January 19, 2006, most of the tests had been completed. Vein mapping had not been

9          done, but, as noted, could have been completed at the hospital. Plaintiffs' expert, Dr.

10         Randolph Noble, noted after reviewing Mr. Aramyan's records that blood typing and

11         cross-matching had not occurred. There was no specific testimony that PTT and pro-time

12         had been completed, although it is possible that these were encompassed in, or were simply

13         different terms for, some of the procedures that the testimony indicated had been

14         completed: i.e., lab studies, a chemistry panel, and a complete blood count.[57]

15   30.   In addition to having pre-operative tests, Mr. Aramyan needed to stop taking aspirin before

16         the surgery.[58]

17   31.   Most relevant in this case, it was necessary to secure the participation of a cardiologist

18         prior to surgery. Although the parties agree that Dr. Yokoyama wanted a cardiologist

19         involved in Mr. Aramyan's treatment in some manner, they dispute the role he intended

20

21   _____

     [52]Id. at 167.
22

23   [53]Id. at 245.

24   [54]Id. at 108.

25   [55]Id. at 270-71.

26   [56]Id. at 116.

27   [57]Id. at 271.

28   [58]Id. at 161, Exh. 41 at 46.

                                          9

the cardiologist to play.   Defendant contends that Dr. Yokoyama envisioned that a cardiologist would see Mr. Aramyan prior to surgery and would address cardiac issues that arose during and after the operation.   Plaintiffs counter that Dr. Yokoyama only wanted to identify a cardiologist who would care for Mr. Aramyan post-operatively; they maintain he did not want a preoperative consultation.

32.   Testimony regarding this issue focused on a note recorded by Dr. Yokoyama after his December 14, 2006 consultation with Mr. Aramyan.   In the note, Dr. Yokoyama wrote, among other things, "we need cardiologist."[59]

33.   The testimony regarding what Dr. Yokoyama intended by the notation "we need cardiologist" was conflicting.[60]   Dr. Yokoyama explained that a cardiologist generally handles the non-surgical medical aspects of a patient's care, because the surgeon handles only the surgery.[61]   The cardiologist follows up with the patient after surgery to deal with post-operative problems, and the same cardiologist may see the patient before surgery, although this is not necessarily the case in every situation.[62]   Dr. Yokoyama stated that there was no rigid practice regarding pre-operative consultations with a cardiologist prior to surgery.

34.   At his deposition, however, Dr. Yokoyama testified that he was referring both to pre-operative care at the hospital and post-operative care when he wrote "we need cardiologist."[63]   He seemed to confirm this statement at trial, stating that he wanted to have a discussion before the operation with the cardiologist who was going to follow Mr.

_____

[59]Exh. 41 at 46.  Dr. Yokoyama also noted "we need pulmonologist."  Apparently, this was due to Mr. Aramyan's history of smoking, although the pulmonologist's role in treatment was not discussed in detail at trial.

[60]RT at 163-65.

[61]*Id.* at 163.

[62]*Id.* at 163-64.

[63]*Id.* at 163.

10

Aramyan after the surgery,[64] that he wanted to have a cardiologist with whom he was familiar review the case pre-operatively,[65] and that he envisioned the review would occur before the surgery took place.[66]  This was consistent with Dr. Yokoyama's deposition testimony that a patient in Mr. Aramyan's position would usually see the cardiologist who was going to care for him post-operatively prior to undergoing surgery.[67]  Nonetheless, he appeared to back away from these statements to some extent when he testified at trial that speaking with a cardiologist was merely a "formality" necessary to secure a cardiologist's participation during the post-operative period.[68]

35.  Overall, Dr. Yokoyama's testimony did not provide a clear picture as to whether he intended for Mr. Aramyan to have a pre-operative consultation with a cardiologist.  Dr. Yokoyama indicated generally, however, that there was no set practice as to whether a CABG surgery patient sees a cardiologist pre-operatively.[69]

36.  Mrs. Yokoyama testified that Dr. Yokoyama's note referred only to the need for a cardiologist to follow Mr. Aramyan post-operatively.[70]  She stated that it was not normal for a patient to be seen pre-operatively by the cardiologist who was going to care for him post-operatively.  This, however, contradicted Dr. Yokoyama's deposition testimony.[71]

37.  Plaintiffs' expert Dr. Noble also expressed an opinion regarding the need for a cardiologist, as discussed in the separate section regarding his testimony below.

---

[64]*Id.* at 165.

[65]*Id.*

[66]*Id.* at 166.

[67]171.

[68]*Id.* at 174.

[69]*Id.* at 164 ("It's not a rigid situation").

[70]*Id.* at 106.  Mrs. Yokoyama is both Dr. Yokoyama's wife and his nurse.  (*Id.* at 86, 88.)

[71]*Id.*

38.  Dr. Yokoyama's notes indicate that he initially contemplated that a cardiologist named Dr. Sroujie at St. Joseph's Medical Center would participate in Mr. Aramyan's care.[72]  This was before Mr. Aramyan switched medical groups, however.  Once Mr. Aramyan switched groups, the cardiologist had to be someone contracted with the new group.[73]

39.  Before a cardiologist could perform services for Mr. Aramyan, an authorization from the IPA was required.[74]  The role of the primary care provider in securing this authorization is to refer the patient to a cardiologist and fill out the paperwork required by the IPA.[75]  The rules of the IPA required that Mr. Aramyan's primary care physician at APHV see him before referring him to a cardiologist for pre-operative or post-operative care.[76]

**F.     Communications Between the Aramyans, APHV and Dr. Yokoyama's Office**

40.  Mr. Aramyan was first seen at APHV on January 18, 2006 by Dr. Pakdaman, and was seen a second time on January 19, 2006 by Dr. Hoh.  On the days of these appointments, and the days preceding them, there were a variety of communications between staff at APHV and staff at Dr. Yokoyama's office.   In addition, there were several communications between APHV and the Aramyans.   The court describes these communications before turning to the appointments themselves.

41.  The earliest conversations between APHV staff and Dr. Yokoyama's office described at trial were conversations in early January to which Mrs. Yokoyama testified.  She stated that the Aramyans called APHV several times beginning January 3, 2006 to schedule an appointment and were told that no appointment was available for two or three weeks.[77]

---

[72]*Id.* at 174-75.

[73]*Id.* at 167.

[74]*Id.* at 399-400.

[75]*Id.* at 398.

[76]*Id.* at 399.

[77]*Id.* at 90-91.

She said that, on January 3 or 4, the Aramyans contacted Dr. Yokoyama's office and enlisted her help in securing an appointment with APHV. Mrs. Yokoyama reported that she called APHV and spoke with Teresita Towner, a licensed vocational nurse employed by APHV,[78] who stated that the clinic was "very busy." Mrs. Yokoyama testified that she then asked to speak with the director and was connected to Dr. Hoh. She stated that Dr. Hoh simply said, "Well, we're busy, but we'll see what we can do," and there was no further conversation.[79]

42.   Mrs. Yokoyama's testimony regarding these early January contacts with APHV was contradicted by Mrs. Aramyan's testimony. When asked whether she had had any interaction with APHV staff prior to January 16, 2006, Mrs. Aramyan testified that her only contact with the clinic was a telephone call that occurred between January 5 and January 16, 2006.[80] Mrs. Aramyan stated that she received a call from a woman at APHV who asked her to schedule an appointment for Mr. Aramyan to be seen at the clinic; she said she replied that she would schedule the appointment after Mr. Aramyan's surgery.[81] This testimony was corroborated by Ms. Towner's testimony. Ms. Towner testified that on January 12, 2006, she called the Aramyans and left a message, noting that surgery had been authorized and asking them to call to make an appointment at APHV, as APHV was Mr. Aramyan's new primary care provider.[82] Ms. Towner stated that Mrs. Aramyan called back and said she would schedule an appointment after Mr. Aramyan's surgery.[83] Based on Ms. Towner's testimony, the conversation described by Mrs. Aramyan occurred

---

[78]*Id.* at 328.

[79]*Id.* at 91-92.

[80]*Id.* at 43-44.

[81]*Id.* at 44.

[82]*Id.* at 335-37.

[83]*Id.* at 337

on January 12; this is consistent with Mrs. Aramyan's testimony that the conversation occurred sometime between January 5 and January 16.  Mrs. Yokoyama testified that her initial contact with Ms. Towner and Dr. Hoh on January 3 or 4 was compelled by the Aramyans' unsuccessful efforts to schedule an appointment beginning January 3.  Mrs. Aramyan's testimony, however, as well as that of Ms. Towner, indicates that, as of January 12, Mrs. Aramyan had not attempted to schedule an appointment with APHV for Mr. Aramyan, and in fact did not believe it was necessary to do so.  Mrs. Yokoyama's testimony that she began attempting to contact APHV in response to the Aramyan's unsuccessful attempts to schedule an appointment is inconsistent with this version of events.  Neither Ms. Towner nor Dr. Hoh testified to the conversations described by Mrs. Yokoyama.  In fact, Dr. Hoh testified that he did not speak with Mrs. Yokoyama or deal with Dr. Yokoyama's office prior to January 16, 2006.[84]

43.   Mrs. Aramyan also testified that her first interaction with Mrs. Yokoyama occurred when she called Dr. Yokoyama's office to obtain an address for the facility Mr. Aramyan had to visit to have a chest x-ray taken.[85]  According to Mrs. Aramyan, Mrs. Yokoyama told her that Mr. Aramyan should not go for the x-ray because the surgery had been cancelled, and that she should schedule an appointment to see Dr. Hoh.[86]  Mrs. Aramyan also testified that she spoke with someone at APHV on January 17, 2006 to schedule an appointment for the next day.  This was consistent with Ms. Towner's testimony; she stated that on January 17, she set an appointment for Mr. Aramyan to come into APHV on January 18, 2006.[87]  Ms. Towner said that she called the Aramyans to inform them of this and spoke with Mrs. Aramyan.  When Ms. Towner advised Mrs. Aramyan that she had scheduled an appointment, Mrs. Aramyan responded that Mr. Aramyan would see

---

[84]*Id.* at 385.

[85]*Id.* at 43.

[86]*Id.*

[87]*Id.* at 338-40; see also Exh. 25.

APHV after the surgery.[88]   Ms. Towner called Dr. Yokoyama's office to ask Mrs. Yokoyama to encourage Mr. Aramyan to keep the appointment.[89]   Although she was unable to speak with Mrs. Yokoyama, Ms. Towner left a message with Tony in Dr. Yokoyama's office, indicating that Mrs. Aramyan had again stated that her husband would see APHV after the surgery.[90]   Mrs. Aramyan subsequently called APHV; when Ms. Towner returned the call at 5:30 p.m. on January 17, she was unable to speak with Mrs. Aramyan, but left a message confirming the appointment in January 18.[91]

44.    This chronology – documented in contemporaneous notes that Ms. Towner created – gives rise to an inference that the conversation with Mrs. Yokoyama to which Mrs. Aramyan testified occurred on January 17, 2006, after Ms. Towner called Dr. Yokoyama's office to explain that Mr. Aramyan needed to come into APHV for an appointment.   The fact the conversation took place on January 17, 2006 indicates that as of that date, it was not clear to Mrs. Aramyan that she needed to schedule an appointment for Mr. Aramyan at APHV prior to the surgery.   This contradicts Mrs. Yokoyama's testimony that, commencing January 3, 2006, the Aramyans tried numerous times to schedule an appointment for Mr. Aramyan at APHV.   Mrs. Aramyan's description of the January 17 call as her first interaction with Mrs. Yokoyama further contradicts Mrs. Yokoyama's version of the events.

45.    For these reasons, the court finds that the conversations on January 3 and 4 between the Aramyans and APHV, the Aramyans and Mrs. Yokoyama, and Mrs. Yokoyama and Ms. Towner and Dr. Hoh that Mrs. Yokoyama described did not occur.[92]

---

[88]RT at 339-40; 56-57; Exh. 25.

[89]RT at 340; Exh. 25.

[90]*Id.*

[91]RT at 341; Exh. 25.

[92]This conclusion is also supported by notes that APHV nurse, Karen Hathaway, made on January 19, 2006 of a conversation with Mrs. Yokoyama.  The notes reflect that Mrs. Yokoyama

46.     Rather, the court finds that APHV and Dr. Yokoyama's office first interacted on January 10, 2006, when APHV forwarded to Dr. Yokoyama's office a copy of the authorization it had received for Mr. Aramyan's surgery from the IPA on January 9, 2006.[93]   Ms. Towner first saw the authorization form on her desk on January 10, 2006.[94]   At all times relevant to this case, Ms. Towner's duties included handling referrals to specialists.[95]   Ms. Towner checked APHV's computers and learned that Mr. Aramyan had never been seen at the clinic.  She mailed a copy of the form to Mr. Aramyan and faxed a copy to Dr. Yokoyama's office.[96]

47.     As previously discussed, Ms. Towner and Mrs. Aramyan had a conversation on January 12, in which Ms. Towner invited Mrs. Aramyan to schedule an appointment for Mr. Aramyan, as APHV was his new primary care provider.  Mrs. Aramyan stated she would schedule an appointment after the surgery.

48.     Mrs. Yokoyama testified that on January 13, 2006, someone at APHV told her to bypass the requirement that Mr. Aramyan be seen at APHV before seeking authorization for the surgery.[97]   At that point, however, Dr. Yokoyama's request for authorization had already been submitted and approved, and a copy of the authorization had been sent to APHV.[98]

---

told Ms. Hathaway that she began to attempt to "facilitate arranging [Mr. Aramyan's] surgery" after the Aramyans called Dr. Yokoyama's office and reported that Mr. Aramyan was experiencing episodes of angina.  (Deposition of Karen Gale Hathaway ("Hathaway Depo."), Exh. 27.)

[93]*Id.* at 418, Exh. 24; Exh. 25.

[94]*Id.* at 333.

[95]*Id.* at 330-31.

[96]*Id.* at 333-34.

[97]*Id.* at 95.

[98]Although Mrs. Yokoyama acknowledged that she had earlier submitted an application for approval of the surgery to the IPA in order to "get [some]body's attention" (*id.* at 96), this does not explain why she would have had a conversation with someone at APHV on January 13 – four

16

49.     Mrs. Yokoyama also testified that on January 13, 2006, she spoke with Ms. Towner, who requested that she fax Mr. Aramyan's medical records to APHV.[99]  Ms. Towner did not testify to this conversation, and no record of a facsimile transmission for January 13 was offered at trial.  Finally, Mrs. Yokoyama stated that on January 13, 2006, someone at APHV gave her the names of facilities that were contracted with the IPA where Mr. Aramyan's pre-operative testing could be performed.[100]  A facsimile transmission sheet bearing a date and time of January 16, 2006 at 8:53 a.m. from Dr. Yokoyama's office to Quest Diagnostics indicates that Mrs. Yokoyama knew by this date that Quest was contracted with the IPA.  There is also a facsimile transmission sheet directed to Burbank Advanced Imaging that was dated January 13 and transmitted on that same day at 6:45 p.m.[101]  There is no specific indication in Dr. Yokoyama's patient file that this information was obtained from APHV as opposed to the IPA or some other source, however.  Mrs. Yokoyama's suggestion, moreover, that she was required to use the test facilities the clinic typically used is contradicted by Ms. Towner's contemporaneous note of a conversation with Mrs. Yokoyama on January 18, in which Mrs. Yokoyama told Ms. Towner that APHV should not perform any blood tests, as she had arranged to have such tests completed by Quest.  Because Ms. Towner's contemporaneous notes contain no reference to a conversation with Mrs. Yokoyama on January 13, however, and because there is no documentary evidence of a fax transmission from Dr. Yokoyama's office to APHV on January 13, the court concludes that not all of the January 13 conversations to which she

---

days after the approval had been received – in which she was told to bypass the requirement that Mr. Aramyan establish a relationship with his primary care physician as a prerequisite to obtaining approval for the surgery.

[99] *Id.* at 111-12.

[100]*Id.* at 112-14.

[101]Exh. 41 at 8, 14, 23, 29.

1    testified occurred.[102]

2    50.    Mrs. Yokoyama called Dr. Hoh on January 16, 2009.  January 16 was Martin Luther

3          King, Jr. Day, so APHV was closed, and Dr. Hoh was on call.[103]  Mrs. Yokoyama and

4          Dr. Hoh testified to two different versions of the conversation.

5    51.    Mrs. Yokoyama testified that the purpose of the call was to identify a cardiologist

6          contracted with the IPA who could care for Mr. Aramyan post-operatively.[104]  She also

7          stated that she raised "issues with having [Mr. Aramyan] appropriately processed through

8          the medical group."[105]  She said that Dr. Hoh told her he had never seen the patient; she

9          responded that the Aramyans had been trying unsuccessfully to arrange an appointment,

10         and that she had faxed Mr. Aramyan's records to APHV twice.[106]  The court has already

11         found that the facts do not support Mrs. Yokoyama's testimony regarding the Aramyans'

12         attempts to schedule an appointment and noted the absence of any documentary evidence

13         supporting Mrs. Yokoyama's assertion that records were faxed prior to January 16.  Mrs.

14         Yokoyama also testified that she told Dr. Hoh Mr. Aramyan's surgery was scheduled for

15         January 19.[107]

16   52.    Dr. Hoh testified that January 16 was the first occasion on which he had spoken with Mrs.

17         Yokoyama. According to Dr. Hoh, Mrs. Yokoyama told him that Mr. Aramyan was

18         scheduled for surgery on January 19.[108]  He testified that he was surprised to receive a call

19         regarding a patient whom APHV had not seen who was scheduled to undergo surgery in

20   
        _____

21   [102]See Exh. 25.

22   [103]Id. at 394.

23   [104]Id. at 115.

24   [105]Id.

25   [106]Id. at 118.

26   [107]Id. at 119.

27   [108]Id.

28   
                                    18

three days.[109]  Dr. Hoh reported that Mrs. Yokoyama advised that, because Mr. Aramyan had switched medical groups, the surgery could no longer be performed at Glendale Hospital as originally scheduled, and Mr. Aramyan needed to be seen by a cardiologist who could care for him peri-operatively at St. Vincent's.[110]  Dr. Hoh stated that Mrs. Yokoyama wanted APHV to "basically give a form clearance" for surgery.[111]  Dr. Hoh said he felt uncomfortable doing so without seeing and establishing a relationship with Mr. Aramyan first.  He told Mrs. Yokoyama that Dr. Yokoyama should proceed with the surgery if Mr. Aramyan's condition was emergent.[112]  He also requested that Mr. Aramyan's records be faxed to APHV.[113]

53.    After his conversation with Ms. Yokoyama, Dr. Hoh sent an email to various APHV employees regarding the conversation.[114]  In the email, Dr. Hoh stated that Ms. Yokoyama had requested "cardiology clearance" for the patient, and reported that he had told her APHV was not familiar with Mr. Aramyan and needed to assess him and refer him to a cardiologist before surgery.  Dr. Hoh's email suggests that he was unaware that the IPA had already authorized surgery for Mr. Aramyan; it states that APHV could not authorize the surgery prior to seeing Mr. Aramyan unless his medical condition was unstable and emergent.  Dr. Hoh asked staff to schedule an appointment for Mr. Aramyan no later than January 19.  He directed that the appointment be made with him or Dr. Mehrdad Pakdaman if Mr. Aramyan had not yet been assigned a primary care physician at APHV.  He further directed that Mr. Aramyan be given an urgent referral to a cardiologist by

---

[109]*Id.* at 395.

[110]*Id.* at 396-97.

[111]*Id.* at 383-84, 427.

[112]*Id.*

[113]*Id.* at 396.

[114]Exh. 28.

1      January 18.[115]

2      54.   Mrs. Yokoyama faxed Mr. Aramyan's medical records to APHV on the afternoon of

3            January 16, 2009.[116]  It is uncertain what became of the records after they were faxed to

4            APHV.

5      55.   As previously noted, on January 17, 2006, Ms. Towner called Mrs. Aramyan to attempt

6            to schedule an appointment for January 18, 2006.  Mrs. Aramyan did not agree to schedule

7            an appointment, so Ms. Towner contacted Dr. Yokoyama's office.   Thereafter, Mrs.

8            Yokoyama communicated to Mrs. Aramyan that it was necessary for Mr. Aramyan to be

9            seen at APHV before the surgery could go forward.   During this conversation, Mrs.

10           Yokoyama also told Mrs. Aramyan that the surgery would not take place on January 19.

11            Mrs. Aramyan subsequently contacted Ms. Towner to confirm her husband's appointment

12           at APHV for January 18.

13     56.   On the morning of January 18, 2006, Ms. Towner was unable to locate Mr. Aramyan's

14           medical records.   She therefore called Dr. Yokoyama's office and requested that the

15           records be faxed to APHV.[117]

16     57.   At approximately midday on January 18, Ms. Towner had a further telephone conversation

17           with Mrs. Yokoyama.[118]  Mrs. Yokoyama stated that Mr. Aramyan's surgery had been

18           rescheduled for one week later.[119]  She stated that APHV should not perform blood tests,

19           as Mr. Aramyan would have blood tests performed at Quest Diagnostic three days before

20     _____

21     [115]*Id.*

22     [116]*Id.* at 366; Exh. 40, Section D at 8-19.

23     [117]*Id.* at 342-43.

24     [118]It is unclear whether this conversation occurred before or after Mr. Aramyan's
25     appointment at APHV on January 18.   Dr. Pakdaman was unaware of Mrs. Yokoyama's
26     instructions at the time of the appointment, however.

27     [119]*Id.* at 345.  Ms. Hathaway's notes of her January 19 conversation with Mrs. Yokoyama
       indicate that Mrs. Yokoyama had ascertained that there was a surgical opening for January 24 if
28     Mr. Aramyan could be seen by a cardiologist by that date.  (Hathaway Depo., Exh. 27.)

1    the surgery.[120]  Mrs. Yokoyama also stated that Mr. Aramyan could have an EKG at the

2    hospital but that, if APHV performed an EKG, it should send a copy EKG directly to Mrs.

3    Yokoyama.[121]  Ms. Towner testified that Mrs. Yokoyama said she simply wanted APHV

4    to establish a relationship with Mr. Aramyan and indicate that he needed surgery.[122]

5    During this conversation, Mrs. Yokoyama asked if Ms. Towner had a list of cardiologists

6    who were contracted with the IPA.  Ms. Towner read names from the list, and Mrs.

7    Yokoyama indicated that she was familiar with two of the names, Dr. Mayeda, and Dr.

8    Matthews.[123]

9    58.   Mrs. Yokoyama testified that on January 18, Dr. Hoh called and told her that the surgery

10   could not go forward on January 19, because he wanted to see Mr. Aramyan himself and

11   could not do so until January 19.[124]  The court does not find this testimony credible.

12   Although Mrs. Yokoyama initially intended to have Mr. Aramyan's blood work performed

13   at APHV, she told Ms. Towner during a conversation that commenced at 12:30 p.m. on

14   January 18 that Quest Laboratories would perform the tests the following week.[125]  This

15   strongly suggests that as of midday on January 18, Mrs. Yokoyama had already

16   rescheduled the surgery.  The evidence was also undisputed that Dr. Hoh was not at

---

[120]Mrs. Aramyan testified that her husband had blood work performed on January 16. Records contained in Dr. Yokoyama's patient file indicate that the tests actually occurred on January 17. (See Ex. 41 at 61.)  The laboratory did not send the results of the tests to Dr. Yokoyama's office until January 20, the day after Mr. Aramyan died.  (*Id.*)

[121]*Id.*  In a subsequent note that Ms. Towner left for Dr. Hoh, she reported that Mrs. Yokoyama wanted any EKG done by APHV to be given to Mr. Aramyan.  (See Exh. 26.)  She testified that Mrs. Yokoyama wanted Mr. Aramyan to take the EKG film with him to another appointment.  (RT at 353.)

[122]*Id.* at 352.

[123]*Id.* at 353.  See also Exh. 40, Section G at 9.

[124]*Id.* at 121.

[125]See Exh. 25.

APHV on January 18 because he was attending a countywide training session that day.[126] Indeed, Mrs. Aramyan testified that Dr. Mehrdad Pakdaman, the doctor who saw Mr. Aramyan on January 18, tried to reach Dr. Hoh on his cell phone while she and her husband were at APHV and that he was unable to do so.[127] The court thus concludes that Mrs. Yokoyama rescheduled the surgery from January 19 to the following week in recognition of the fact that several necessary pre-operative steps could not be completed by January 19. Specifically, on the afternoon of January 18, Mr. Aramyan saw Dr. Pakdaman, who referred him to a radiology clinic for a chest X-ray that afternoon, and told him to return to APHV in the morning, after fasting, for blood work.[128] Dr. Pakdaman also referred Mr. Aramyan to a cardiologist and told him to see Dr. Hoh the next day when he came in for blood work, because Dr. Hoh could facilitate or expedite the cardiologist referral.[129]

59.    At 10:12 a.m. on January 19, Karen Hathaway, an RN and associated manager of APHV's nursing department, answered a telephone call from Mrs. Aramyan.[130] Mrs. Aramyan

---

[126]RT at 291, 401.

[127]Id. at 46.

[128]Id. at 293. It appears that both APHV and Mrs. Yokoyama believed, as of January 18, that Mr. Aramyan still needed to have blood tests taken, as Dr. Pakdaman told Mr. Aramyan to return to APHV for the tests the following day after he had been fasting, and Mrs. Yokoyama told both Ms. Towner on January 18 and Ms. Hathaway on January 19 that Mr. Aramyan could have the tests done at Quest Diagnostics. (See Exh. 40, Section F at 13-14; Hathaway Depo., Exh. 27.)

[129]Id. at 311. See also Exh. 19, 20. Other pre-operative tests – vein mapping and type and cross-matching of blood – were required as well and had not been performed. There was testimony, however, that both vein mapping and type and cross-matching could have been done in the hospital on the day of surgery if Mr. Aramyan's condition was emergent. (See RT at 141, 245, 270-71.)

[130]Ms. Hathaway's responsibilities generally involved managing the pharmaceutical dispensary. She also worked approximately once a week in the triage department, answering phone calls from patients. (Hathaway Depo. at 12-13, 17, 25-26.)

1    stated that she was the wife of a patient who was scheduled to have surgery that day, and

2    was upset that the surgery had been postponed.[131]

3    60.    Ms. Hathaway told Mrs. Aramyan that she would attempt to answer her questions.  She

4    pulled up Mr. Aramyan's information in her computer and learned that he had been seen

5    by Dr. Pakdaman the previous day.[132]  Dr. Pakdaman told Ms. Hathaway that the surgery

6    had already been postponed at the time he saw Mr. Aramyan.[133]  After speaking with Dr.

7    Pakdaman, Ms. Hathaway contacted Mrs. Yokoyama.[134]  Mrs. Yokoyama told her that the

8    surgery had been postponed because Dr. Hoh could not clear Mr. Aramyan for surgery

9    until the January 18 appointment.[135]

10    61.    Mrs. Azoyan testified that on January 18, she called Dr. Hoh and asked him why the

11    surgery was cancelled, and he told her she was overreacting.[136]  As Dr. Hoh was not in the

12    office on January 18, the court does not find this testimony credible.

13    62.    Dr. Hoh spoke with Rita Yokoyama after he saw Mr. Aramyan.[137]  The two recounted

14    different versions of the conversation.  Mrs. Yokoyama asserted that Dr. Hoh told her he

15    was sending Mr. Aramyan to see a cardiologist for a second opinion.[138]  Dr. Hoh stated

16    that he informed Mrs. Yokoyama he had arranged an appointment with a cardiologist, but

17    did not state that the purpose of the visit was for a second opinion.[139]  The court does not

18

19    [131]*Id.* at 29-30.

20    [132]*Id.* at 58-59.

21    [133]*Id.* at 49.

22    [134]*Id.* at 59.

23    [135]*Id.* at 63-64.

24    [136]RT at 182.

25    [137]*Id.* at 407-08.

26    [138]*Id.* at 119.

27    [139]*Id.* at 408.

28

find Mrs. Yokoyama's testimony regarding the conversation credible. Specifically, the court not believe that Dr. Hoh stated the purpose of the cardiology appointment was to obtain a second opinion. Rather, the purpose of the appointment was to arrange for Mr. Aramyan to be seen preoperatively by a cardiologist who could care for him intra-operatively and post-operatively. This is what Dr. Hoh understood Mrs. Yokoyama requested on January 16, 2006.[140]

### G.   Mr. Aramyan's January 18 Appointment

63.   Mr. Aramyan was seen at APHV on the afternoon of January 18, 2006 by Dr. Pakdaman as Dr. Hoh was not in the office.[141] Mrs. Aramyan accompanied Mr. Aramyan on the visit.[142]

64.   Dr. Pakdaman attended medical school at Melli University in Iran, which he described as the best medical school in Iran. He passed the California boards in 2001, and did his residency and internship at Harbor UCLA.[143] He is board certified in family medicine.[144] In January 2006, he was a clinician at APHV.[145] His practice consisted primarily of assisting patients with chronic diseases, including cardiac diseases.[146]

65.   Typically, a chart for a new patient at APHV is prepared on the date of the patient's first visit. The patient fills out an intake form and then sees a "financial screener." The financial screener prepares the patient's chart.[147]

---

[140]See Exh. 40, Section E at 1.

[141]RT at 290.

[142]Id. at 284.

[143]Id. at 305.

[144]Id. at 281.

[145]Id. at 282.

[146]Id. at 305.

[147]Id. at 361-62.

66.   The only information in the chart given to Dr. Pakdaman were answers to patient questionnaires and Mr. Aramyan's vital signs.[148]  Dr. Pakdaman did not speak with Dr. Hoh prior to the consultation.[149]  He could not recall whether he had seen Dr. Hoh's January 16, 2006 email before the consultation.[150]  Dr. Pakdaman testified that all he knew about the purpose of the visit was that Mr. Aramyan was scheduled for CABG surgery and needed a pre-operative consultation.  He obtained this information from Mr. and Mrs. Aramyan.[151]

67.   Mrs. Aramyan told Dr. Pakdaman that "everything had been done" that was necessary for Mr. Aramyan to proceed with surgery.[152]  Dr. Pakdaman interpreted this statement to mean that Mr. Aramyan had already had an angiogram.[153]  He believed the purpose of the visit was pre-operative evaluation, which he described as encompassing blood work and chest x-rays.  Essentially, Dr. Pakdaman believed his role was to collect information to provide to the surgeon.[154]

68.   Mr. Aramyan told Dr. Pakdaman that he was able to swim one mile without chest pain or shortness of breath, and that he could walk three miles before experiencing chest pain.[155]

69.   Dr. Pakdaman performed an EKG.[156]  In Dr. Pakdaman's opinion, the EKG was "bad" and indicated considerable ischemia.  Based on the EKG, he considered Mr. Aramyan's

---

[148]*Id.* at 286.

[149]*Id.* at 285.

[150]*Id.* at 287.

[151]*Id.*

[152]*Id.* at 289.

[153]*Id.* at 289-90.

[154]*Id.* at 296-97.

[155]*Id.* at 310.

[156]*Id.* at 291.

25

condition urgent, and believed Mr. Aramyan should have surgery as soon as possible.[157]

70.  Dr. Pakdaman referred Mr. Aramyan to a radiology clinic to have a chest x-ray performed that day.[158] He also told Mr. Aramyan to fast and return to the clinic the next day for blood tests.[159] He did not refer Mr. Aramyan for vein mapping, as that was something that could be done at the hospital.[160]

71.  In order for Mr. Aramyan to see a cardiologist, it was necessary to complete a referral form and obtain authorization from the IPA.[161] There was no way to bypass this process in a non-emergent situation.[162] Dr. Pakdaman filled out a referral form for a cardiologist appointment, and gave the form to Ms. Towner.[163] The referral filled out by Dr. Pakdaman was a direct referral form.[164] Dr. Pakdaman told Mr. Aramyan to see Dr. Hoh when he returned the next day, so that Dr. Hoh could expedite or facilitate the cardiology consultation.[165]

72.  Although Dr. Pakdaman filled out a cardiologist referral form on January 18, he testified that he wanted Mr. Aramyan to see Dr. Hoh on January 19 so that Dr. Hoh could facilitate

[157]*Id.* at 292.

[158]*Id.* at 292-93.

[159]*Id.* at 293.

[160]*Id.* at 302.

[161]*Id.* at 315.

[162]*Id.* at 316.

[163]*Id.* at 322.

[164]Dr. Hoh explained that "[a] direct referral [of the type Dr. Pakdaman prepared] is a quick referral to initiate processes, in order to be able to help a patient, to be able to see the cardiologist or other specialist," while "a full authorization is what is required for on-going care as well as potential care in the hospital by the specialist." (*Id.* at 413.) A full authorization allows the specialist to perform procedures on the patient, while a direct referral merely authorizes an office visit. (*Id.*)

[165]*Id.* at 292-93.

the referral.[166]  He appeared to suggest that because Mr. Aramyan had to return for blood tests in any event, he should see Dr. Hoh when he came because Dr. Hoh could expedite the cardiology referral.[167]   Dr. Hoh testified that it was not normal procedure for Dr. Pakdaman to ask Mr. Aramyan to see Dr. Hoh after he had already been seen by Dr. Pakdaman.  Dr. Hoh was "not entirely sure" why Dr. Pakdaman arranged for him to see Mr. Aramyan a second time on January 19; he testified, however, that he believed Dr. Pakdaman may have wanted Dr. Hoh to see Mr. Aramyan to make sure everything had been done properly, as Dr. Pakdaman was relatively new to the clinic, and Mr. Aramyan was going to return for blood tests in any event.[168]  Dr. Hoh testified that the cardiology referral Dr. Pakdaman initiated on January 18 resulted in an appointment with Dr. Matthews for Monday, January 23.  The following day, as described in more detail below, Dr. Hoh was able to contact Dr. Matthews' office and arrange for the appointment to be moved up to January 20.[169]

73.   Dr. Pakdaman also instructed Mr. Aramyan to stop taking aspirin, and told Mr. and Mrs. Aramyan to call 911 if Mr. Aramyan experienced any shortness of breath or chest pains.[170]

**H.     January 19, 2009**

74.   Mr. Aramyan's appointment with Dr. Hoh was scheduled for the afternoon of January 19,

---

[166]*Id.* at 293, 324.

[167]*Id.* at 292-93 ("Q. You also told the patient that he had to come back the next day to see Dr. Hoh in order to facilitate that cardiology.  Is that true?  A. Yes.  And also for follow-up of the lab results. . . I told him go to the X ray today.  Come for the blood test tomorrow morning fasting, and then have a follow-up with Dr. Hoh to facilitate the process").

[168]*Id.* at 457-58.

[169]*Id.* at 406, 409.

[170]*Id.* at 313.

1   at approximately 12 noon or 1 p.m.,[171] and lasted approximately forty-five minutes.[172]

2   Gary Azoyan accompanied Mr. Aramyan to the appointment.[173]

3   75.   By the time Dr. Hoh saw Mr. Aramyan, Dr. Yokoyama's medical records regarding Mr.

4   Aramyan had been added to his chart at APHV, and were available to Dr. Hoh.[174]   The

5   EKG taken by Dr. Pakdaman was also included in the chart.[175]

6   76.   Mr. Aramyan did not tell Dr. Hoh that he was in pain at the time of the appointment.[176]

7   Dr. Hoh did not believe that Mr. Aramyan was in imminent danger of having a heart

8   attack, as he did not complain of chest pain, was not short of breath, and was not

9   sweating.[177]   Dr. Hoh did not believe Mr. Aramyan's condition was emergent.[178]   He

10   considered the EKG taken by Dr. Pakdaman abnormal; even after comparing it with the

11   prior EKG that Mr. Aramyan had had taken, however, his opinion was that the EKGs did

12   not indicate Mr. Aramyan would suffer a heart attack immediately.[179]

13   77.   Dr. Hoh checked Mr. Aramyan's blood pressure and found it to be abnormally high; he

14   prescribed a higher dose of a medication called Norvasc to address this issue.[180]   He also

15   prescribed Isosorbide to open Mr. Aramyan's blood vessels, Zantac for dyspepsia, and

16

17

18   [171]*Id.* at 193.

19   [172]*Id.* at 413.

20   [173]*Id.* at 190.

21   [174]*Id.* at 455.

22   [175]*Id.*

23   [176]*Id.* at 404.

24   [177]*Id.* at 412.

25   [178]*Id.* at 434.

26   [179]*Id.* at 458.

27   [180]*Id.* at 402, 407.

28

refilled Mr. Aramyan's prescription for Atenolol, a beta blocker.[181]  Finally, Dr. Hoh prescribed nitroglycerine, as Mr. Aramyan's current supply had gone stale and was ineffective.[182]

78.  Dr. Hoh telephoned the office of Dr. Ray Matthews, a cardiologist, and arranged for Mr. Aramyan to be seen the next day.[183]  He explained to Mr. Aramyan and Gary Azoyan that the appointment with Dr. Matthews was necessary and was at Dr. Yokoyama's request.[184]  Dr. Hoh prepared an authorization for Mr. Aramyan to see Dr. Matthews; unlike the form Dr. Pakdaman prepared, the form Dr. Hoh completed was a full authorization.[185]

79.  Dr. Hoh advised Mr. Aramyan to go to the emergency room if he experienced chest pain.[186]

80.  Mr. Aramyan began to experience chest pain after dinner that evening, and Mrs. Aramyan drove him to St. Joseph's Hospital.[187]  He was admitted to the emergency room, and passed away that evening, at age 47.[188]

---

[181]*Id.* at 407, 472.

[182]*Id.* at 402-03.  Mr. Azoyan testified that Dr. Hoh said Mr. Aramyan's condition could be cured by medicine rather than surgery.  (*Id.* at 191.)  Given Dr. Hoh's testimony, the court believes Mr. Azoyan simply misunderstood Dr. Hoh, and finds that Dr. Hoh did not make such a statement.  Mr. Azoyan stated that he asked Dr. Hoh why Mr. Aramyan needed to see him that day, and that Dr. Hoh simply ignored the question.  (*Id.* at 191-92.)  The court similarly does not credit this testimony, as Mr. Azoyan later testified that he could not remember well, and that it may have been the case that Dr. Hoh answered the question, and he simply did not remember the response.  (*Id.* at 200.)

[183]*Id.* at 409.

[184]*Id.* at 411-12.

[185]*Id.* at 413-14.  The IPA approved the authorization on January 20, 2006. (*Id.* at 416, Exh. 20.)

[186]*Id.* at 411-12.

[187]*Id.* at 48.

[188]*Id.*

1    **I.      Dr. Noble's Testimony**

2            **1.      Dr. Noble's Background**

3    81.   Dr. Randolph Noble testified as an expert witness for plaintiffs.  Dr. Noble is currently

4          a primary care physician.  He graduated from UCLA Medical School in 1973 and

5          completed an internship in internal medicine at USC Medical Center in 1974.  He did his

6          residency in internal medicine at West Los Angeles Veterans Administration Hospital

7          ("WLAVAH"), which included rotations in cardiology.  From 1977 to 1979, Dr. Noble

8          had a fellowship in pulmonary diseases at WLAVAH, focusing on cardiopulmonary

9          problems in the intensive care unit and in the laboratory.  Dr. Noble is board-certified in

10         internal medicine, pulmonary diseases, psychiatry and hyperbaric medicine, and is a fellow

11         of the American College of Chest Physicians.  He estimates that he has performed more

12         than a thousand pre-operative consultations for patients with cardiopulmonary problems,

13         including in excess of one hundred consultations prior to CABG procedures.[189]

14   82.   Dr. Noble testified that, in his opinion, two breaches of the standard of care occurred in

15         this case.

16           **2.      First Breach: Inadequate Chart Provided to Dr. Pakdaman**

17   83.   First, Dr. Noble stated that APHV's failure to provide Dr. Pakdaman with a complete

18         chart at the time of Mr. Aramyan's January 18 appointment breached the standard of

19         care.[190]

20   84.   Dr. Noble testified that the records provided to Dr. Pakdaman should have included the

21         authorization for the CABG surgery received by APHV on January 9, 2006, the records

22         from Dr. Yokoyama's office, and Dr. Hoh's email regarding his January 16, 2006

23         conversation with Rita Yokoyama.[191]

24   85.   Dr. Noble conceded, however, that the authorization would not have provided Dr.

25   ─────────────────────

26   [189]*Id.* at 215-21.

27   [190]*Id.* at 231.

28   [191]*Id.* at 231-33, 237.

Pakdaman with any information beyond that which Mr. and Mrs. Aramyan gave him on January 18, 2006.[192]  He also testified that in his opinion, the EKG that Dr. Pakdaman performed was sufficient to indicate that Mr. Aramyan needed surgery.  Dr. Noble stated, however, that the results of the 2005 EKG would have "been extremely helpful in appreciating the urgency of the situation."[193]  Additionally, Dr. Noble felt that, had Dr. Pakdaman been able to review them, the records of Mr. Aramyan's December 14, 2005 consultation with Dr. Yokoyama would have indicated "the severity of [Mr. Aramyan's] multi-vessel coronary artery disease[,] as well as his . . . primary problem with his heart as a pump with decreased ejection fraction."[194]  Finally, Dr. Noble noted that Dr. Hoh's email indicated that Dr. Yokoyama contemplated surgery on January 19, 2006.[195]

86.    Dr. Noble opined that Dr. Pakdaman should have known that the EKG he performed on January 18, 2006 "could represent an impending heart attack."[196]  He based this opinion on the fact that certain waves in the EKG, known as T waves, were deeply inverted.  This indicated "acute ischemia."[197]  Dr. Noble concluded that the EKG indicated "an impending anterolateral wall myocardial infraction."[198]  He opined that if Dr. Pakdaman had been able to compare the January 18 EKG with the December 9, 2005 EKG, he would have concluded that Mr. Aramyan "was moving toward a heart attack."[199]  He testified,

---

[192]*Id.* at 273.

[193]*Id.* at 276.

[194]*Id.* at 233.

[195]*Id.* at 236.  Dr. Hoh, who was designated as an expert witness, also testified that, ideally, the medical records and authorization should have been provided to Dr. Pakdaman.  (*Id.* at 437-38.)

[196]*Id.* at 241.

[197]*Id.* at 240-41.  Ischemia is lack of blood supply.  (*Id.* at 242.)

[198]*Id.* at 244.

[199]*Id.* at 245.

however, that in his opinion the January 18 EKG did not require the immediate hospitalization of Mr. Aramyan.[200]  Dr. Noble conceded that Mr. Aramyan's condition at the time he saw Dr. Pakdaman was not emergent, i.e., he did not need immediate surgery.[201]

87.   Dr. Noble testified that in his opinion, to a reasonable medical probability, the exclusion of materials from the chart given to Dr. Pakdaman delayed Mr. Aramyan's surgery.[202]  He did not, however, identify any action Dr. Pakdaman would have taken had the material omitted from the chart been available to him.[203]

88.   Dr. Noble did not believe that Dr. Pakdaman breached the standard of care given the materials available to him.[204]  Rather, he found that the breach was APHV's failure to prepare an adequate chart for Dr. Pakdaman.

### 3.     Second Breach: Requiring an Appointment

89.   Dr. Noble also testified that, in his opinion, Dr. Hoh breached the standard of care by requiring that Mr. Aramyan be seen at APHV prior to surgery, and by requiring that Mr. Aramyan be seen by a cardiologist before the surgery.[205]  He testified that this breach "contributed directly" to Mr. Aramyan's death by delaying the surgery, and that he had

---

[200]*Id.* at 247.  At trial, Dr. Noble expressed the opinion that, on January 18, 2006, Mr. Aramyan had a "twenty-four hour window" in which to have surgery.  The court struck that testimony, however, because Dr. Noble's opinion regarding a twenty-four window was not included in his expert report or deposition.  (*Id.* at 264-66.)  As a result, the court has not considered this aspect of Dr. Noble's testimony in making findings of fact and conclusions of law.

[201]*Id.* at 260.

[202]*Id.* at 231.

[203]Similarly, Dr. Hoh testified that in his opinion Dr. Pakdaman would not have done anything differently had the material in question been provided to him.  (*Id.* at 463.)

[204]*Id.* at 257.

[205]*Id.* at 248.

1  reached these opinions to a reasonable degree of medical probability.[206]

2  90.  Dr. Noble did not believe Mr. Aramyan's condition was emergent on January 19, 2006,

3  when Dr. Hoh saw him.[207]

4  **4.  Opinions Regarding Role of Cardiologist**

5  91.  Dr. Noble opined that in mid-January, it was "not absolutely necessary" for Mr. Aramyan

6  to be seen pre-operatively by a cardiologist.[208]  He agreed, however, that it was necessary

7  for Mr. Aramyan to be seen post-operatively by a cardiologist.[209]  He also agreed that pre-

8  operative tests are generally done a few days before the surgery.[210]

9  **5.  Opinion Regarding Life Expectancy**

10  92.  Dr. Noble opined that Mr. Aramyan "would be alive today" if he had undergone CABG

11  surgery on January 19.[211]  He testified that Mr. Aramyan's life expectancy would have

12  been ten to fifteen years, based on various risk factors, including his smoking, history of

13  hypertension, multiple vessel coronary artery disease, and decreased ejection fraction.[212]

14  This opinion, however, was based on the assumption that Mr. Aramyan would successfully

15  have stopped smoking.[213]  Had Mr. Aramyan not quit smoking, Dr. Noble believed his life

16  expectancy would have decreased by three years.[214]

17  93.  Dr. Noble testified that, in general, the likelihood that a smoker could successfully quit

18  _____

19  [206]*Id.*

20  [207]*Id.* at 260.

21  [208]*Id.* at 270.

22  [209]*Id.*

23  [210]*Id.* at 271.

24  [211]*Id.* at 249.

25  [212]*Id.* at 250-51.

26  [213]*Id.* at 251.

27  [214]*Id.*

28

1    was less than ten percent, or twenty percent if medicines were used.[215]  He testified that

2    he believed CABG surgery patients were more likely to quit smoking, but could not cite

3    any authority to support this opinion.[216]

4    **J.    Dr. Bleifer's Opinions**

5        **1.    Dr. Bleifer's Background**

6    94.    Dr. Selvyn Burton Bleifer testified as an expert for defendant.  Dr. Bleifer is a specialist

7        in cardiovascular disease.  He attended medical school at the University of California, San

8        Francisco, and interned at the University of California Medical Center in San Francisco.

9        He completed a two-year residency in internal medicine at the Veterans Administration

10       Hospital in Boston and a one-year residency in cardiology at Mt. Sinai Hospital in New

11       York.  Dr. Bleifer is board-certified in internal medicine and cardiovascular disease.[217]

12       He is presently in private practice in Beverly Hills, focusing on cardiovascular disease, and

13       has authored or co-authored approximately 65 articles concerning cardiovascular medicine

14       that have appeared in peer-reviewed journals.[218]

15   95.    In his current practice, Dr. Bleifer sees patients contemplating CABG surgery.  He

16       testified that he typically sees patients both pre-operatively and post-operatively; he stated

17       that this is the standard of care in the field.[219]

18   96.    Dr. Bleifer was critical of the treatment provided to Mr. Aramyan by doctors at Glendale

19       Adventist Hospital in 2008.  He opined that the physicians should have recommended to

20       Mr. Aramyan an implanatable cardiac defibrillator, because patients with reduced ejection

21       fractions, such as Mr. Aramyan, have a high risk of ventricle arrhythmias and sudden

22

23   ───────────────

     [215]*Id.* at 254.
24

25   [216]*Id.* at 254.

26   [217]*Id.* at 465-66.

27   [218]*Id.* at 466-67.

28   [219]*Id.* at 469.

death.[220]   Although Dr. Bleifer believed that Mr. Aramyan might have benefitted from CABG surgery, he opined that the implantable defibrillator would have been the most advantageous procedure for Mr. Aramyan to have undergone.[221]   He also believed the doctors should have prescribed Carbetalol or Coreg as a beta blocker rather than atenolol, although he did not elaborate on this opinion.[222]

97.   Dr. Bleifer testified that when APHV received the approval for Mr. Aramyan's surgery on January 9, 2006, the standard of care did not require that APHV do anything other than fax the form to Dr. Yokoyama and send it to the Aramyans.[223]

98.   Dr. Bleifer opined that APHV did not breach the standard of care in its preparation of Mr. Aramyan's chart prior to his appointment with Dr. Pakdaman.   Dr. Bleifer based this opinion on the fact that APHV had not yet received medical records from Dr. Yokoyama's office.[224]

99.   Dr. Bleifer also testified that, had the information in the records been available to Dr. Pakdaman, Dr. Pakdaman would not have acted differently, because, in his opinion, Mr. Aramyan's condition was not emergent at the time of the appointment.   Dr. Bleifer conceded, however, that having the earlier EKG available for comparison would have been of benefit to Dr. Pakdaman.[225]   Based on Mr. Aramyan's statements regarding his ability to exercise, Dr. Bleifer concluded that Mr. Aramyan had stable angina pectoralis, or chest pain that occurs after exertion and is relieved by rest.   This, Dr. Bleifer stated, indicates

---

[220]*Id.* at 472.

[221]*Id.* at 473.

[222]*Id.* at 472.

[223]*Id.* at 474-75.

[224]*Id.* at 475-76 (stating that the medical records were not received from Dr. Yokoyama's office until January 18).

[225]*Id.* at 493.

1    a non-emergent condition.[226]

2    100.    Based on Mr. Aramyan's ability to exercise, his history, and the results of the EKG taken

3            by Dr. Pakdaman, Dr. Bleifer opined that there was no emergent need for Mr. Aramyan

4            to have CABG surgery within "the next day or so" on January 18, 2006.[227]

5    101.    In Dr. Bleifer's opinion, the EKG performed by Dr. Pakdaman did not indicate that Mr.

6            Aramyan was in danger of having an imminent heart attack.[228] He did not believe that Dr.

7            Pakdaman should have done anything differently than he did to meet the standard of

8            care.[229]

9    102.    Dr. Bleifer also found that Dr. Hoh's treatment of Mr. Aramyan was well within the

10           standard of care.  He noted that Dr. Hoh had arranged for Mr. Aramyan to see Dr.

11           Matthews the day after he saw Dr. Hoh, and that Mr. Aramyan's condition was stable as

12           of January 19, 2006.[230]

13   103.    Dr. Bleifer also opined that Dr. Hoh's actions in response to his conversation with Ms.

14           Yokoyama on January 16, 2006 were within the standard of care.   Specifically, he stated

15           that Mr. Aramyan declined to come into APHV on January 17, and that APHV prevailed

16           on Dr. Yokoyama's office to convince him to come in on January 18.  Because Dr. Hoh

17           was not in the office that day, Mr. Aramyan saw Dr. Pakdaman.[231] Dr. Bleifer stated that

18           in his opinion, Dr. Hoh did not breach the standard of care at any time either before or

19

20    _____

21    [226]*Id.* at 476-77.

22    [227]*Id.* at 477.

23    [228]*Id.* at 479-80.

24    [229]*Id.* at 480-81.

25    [230]*Id.* at 481-82.

26    [231]*Id.* at 482-83.  Dr. Bleifer's belief that Mr. Aramyan was offered an appointment on
      January 17 does not square with the records in APHV's files.  Ms. Towner's notes, as well as her
27    testimony, indicate that she called the Aramyans on January 17 to offer an appointment on January
28    18.  See RT at 338-40; Exh. 25.)

after January 16.[232]   He also opined that Dr. Hoh did not do anything that breached the standard of care prior to the time he spoke with Mrs. Yokoyama on January 16.[233]

104.   According to Dr. Bleifer, Mr. Aramyan died due to sudden cardiac death.  Sudden cardiac death occurs when the heart fibrillates and fails to pump blood; the fibrillation is caused either by an occlusion or ischemia.  Dr. Bleifer opined that an implantable defibrillator would have prevented the death.[234]

105.   Dr. Bleifer testified that in his opinion, Mr. Aramyan's life expectancy had he survived would have been five to eight years, based on his atherosclerosis, coronary artery disease, family history of heart trouble, and prior heart attack and stent.[235]

106.   Any conclusions of law that are  deemed to be findings of fact are incorporated herein as such.

## II.  CONCLUSIONS OF LAW

### A.      Legal Standards Under Federal Tort Claims Act

1.    The United States was substituted as defendant in place of APHV and Dr. Hoh pursuant to 28 U.S.C. § 2679(d)(1), because APHV and the clinic are deemed employees of the Public Health Service under the Federally Supported Health Centers Act of 1992, 42 U.S.C. § 233(g).  Accordingly, the Federal Tort Claims Act ("FTCA") provides the exclusive remedy for plaintiffs in this case.  See 28 U.S.C. § 2679(b)(1).  Under the FTCA, "district courts . . . have exclusive jurisdiction of civil actions or claims against the United States . . . for death caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  Because plaintiff's claims arose in California, liability under the

---

[232]RT at 484.

[233]Id. at 484-85.

[234]Id.

[235]Id. at 485-86.

FTCA is determined by reference to California law.  See *United States v. English*, 521 F.2d 63, 65 (9th Cir. 1975).

**B.**   **Legal Standards Governing Liability for Medical Malpractice**

2.   Under California law, to prevail on a medical malpractice claim, a plaintiff must establish that: (1) defendant owed a duty "to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise"; (2) defendant breached that duty; (3) the breach was a proximate cause of injury to the plaintiff; and (4) plaintiff suffered resulting loss or damage. *Johnson v. Superior Court*, 143 Cal.App.4th 297, 305 (2006) (citing *Hanson v. Grode*, 76 Cal.App.4th 601, 606 (1999)); see also *Estate of Burkhart v. United States*, No. C 07-5467 PJH, 2009 WL 1066278, *7 (N.D. Cal. Apr. 21, 2009) ("The elements of a claim of medical malpractice are a duty to use such skill, prudence, and diligence as other members of the medical profession commonly possess and exercise; a breach of that duty; a proximate causal connection between the negligent conduct and the injury; and resulting loss or damage").

3.   A physician's duty of care to a patient does not arise until a physician-patient relationship is established.  *Mero v. Sadoff*, 31 Cal.App.4th 1466, 1471 (1995) (citing *Felton v. Schaeffer*, 229 Cal.App.3d 229, 235 (1991) and *Keene v. Wiggins*, 69 Cal.App.3d 308, 313-314 (1997)); see also *Rainer v. Grossman*, 31 Cal.App.3d 539, 543 (1973) ("In the usual case of medical malpractice the duty of care springs from the physician-patient relationship which is basically one of contract"); B.E. Witkin, SUMMARY OF CALIFORNIA LAW § 935 (10th ed. 2005) ("Liability for malpractice arises where there is a relationship of physician-patient between the plaintiff and the defendant doctor; the relationship gives rise to a duty of care").

4.   "As a general proposition, a physician-patient relationship exists in California where the relationship between a physician and a patient is created as part of, or for the purpose of, providing medical treatment." *Jett v. Penner*, No. CIV S-02-2036 GEB JFM, 2007 WL 1813699, *5 (E.D. Cal. June 22, 2007) (citing *Keene v. Wiggins*, 69 Cal.App.3d 308, 313 (1977)).  "In addition, a duty of care may arise where a physician has affirmatively

increased the risk of harm to the patient." *Hudson v. Wali*, No. E032348, 2003 WL 1154188, *3 (Cal.App. Mar. 14, 2003) (citing *Zepeda v. City of Los Angeles*, 223 Cal.App.3d 232, 235-236 (1990), *Clarke v. Hoek*, 174 Cal.App.3d 208, 217 (1985), and *Zelig v. County of Los Angeles*, 27 Cal.4th 1112, 1128-1129 (2002); *id.* ("Assuming Dr. Wali had voluntarily undertaken to be on call, he might be deemed to have accepted any and all patients – sight unseen – who needed him while he was on call.  On this theory, he could have had a duty to Hudson which was violated by his very refusal to provide care").[236]

5.   The California Supreme Court has stated that "[t]he standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by [expert] testimony. . ., unless the conduct required by the particular circumstances is within the common knowledge of the layman." *Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal.4th 992, 1001 (1994) (quoting *Landeros v. Flood,* 17 Cal.3d 399, 410 (1976) (in turn quoting *Sinz v. Owens*, 33 Cal.2d 749, 753 (1949) and *Huffman v. Lindquist*, 37 Cal.2d 465, 473 (1953) (internal quotation marks omitted)); see also *Johnson*, 143 Cal.App.4th at 305 ("[E]xpert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson," quoting *Kelley v. Trunk*, 66 Cal.App.4th 519, 523 (1998)).

6.   The "common knowledge" exception to the requirement that expert testimony is necessary to establish the standard care "is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'"

---

[236]District courts may rely on unpublished state court decisions as persuasive authority. See, e.g., *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220  n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value").

*Flowers*, 8 Cal.4th at 1001 (quoting *Engelking v. Carlson*, 13 Cal.2d 216, 221 (1939), disapproved on other grounds, *Siverson v. Weber*, 57 Cal.2d 834, 836-837 (1962)).  In this regard, the "classic example . . . is the X-ray revealing a scalpel left in the patient's body following surgery." *Id.*

7.    Like the standard of care, "causation and injury generally must be proven within reasonable medical probability based on competent expert testimony." *Burkhart*, 2009 WL 1066278 at *8 (citing *Jennings v. Palomar Pomerado Health Sys., Inc.*, 114 Cal.App.4th 1108, 1118 (2003)); see also *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal.App.3d 396, 402-03 (1985) ("[I]n a personal injury action causation must be proven within a reasonable medical probability based [on] competent expert testimony").

**C.    Whether APHV Is Liable for Malpractice Based on Inadequate Preparation of A Chart for Dr. Pakdaman**

8.    The first breach of the standard of care identified by Dr. Noble was APHV's failure properly to create a chart prior to Mr. Aramyan's appointment with Dr. Pakdaman.

9.    APHV staff owed a duty of care to Mr. Aramyan to prepare an adequate chart for use by Dr. Pakdaman during the January 18, 2006 consultation, as the clinic had undertaken to care for Mr. Aramyan.  See *Jett*, 2007 WL 1813699 at *5.[237]

10.    Based on Dr. Noble's testimony, the court concludes that the applicable standard of care required APHV to prepare a chart containing information that would facilitate Dr. Pakdaman's care of Mr. Aramyan.

11.    The authorization for Mr. Aramyan's surgery was received by the clinic on January 9, 2006; Dr. Hoh prepared an email memorializing his conversation with Mrs. Yokoyama on January 16, 2006; and Mr. Aramyan's medical records were faxed to the clinic from

---

[237]The court has not found a California case specifically addressing when the duty of medical staff to prepare a proper chart arises.  The court concludes that the duty arises as an adjunct and extension of the creation of a physician-patient relationship with a doctor.  This follows *Bellamy v. Appellate Department*, 50 Cal.App.4th 797, 808 (1996), in which a California appellate court explained that an x-ray technician's duty to set the brake on a rolling x-ray table properly arose out of the physician-patient relationship.

Dr. Yokoyama's office on January 16, 2006. Dr. Noble testified that the failure to include these items in the chart prepared on January 18 breached the applicable standard care. Dr. Noble's testimony was corroborated by Dr. Hoh's concession that the information should have been available to Dr. Pakdaman on January 18, 2006. While Dr. Bleifer disagreed with Dr. Noble's opinion in this regard, he based his contrary assertion on a belief that APHV had not received any records from Dr. Yokoyama's office prior to January 18. The court has found otherwise, however. Further, Dr. Bleifer testified that it would have been beneficial for Dr. Pakdaman to have Mr. Aramyan's prior EKG available for comparison at the time of the January 18, 2006 visit. Based on all the evidence and testimony in the record, the court concludes that APHV's failure to include the authorization, Dr. Hoh's January 16 note, and Mr. Aramyan's medical records in the chart prepared for Dr. Pakdaman breached the duty of care it owed to Mr. Aramyan.

12.   The court cannot, however, conclude that this breach was a proximate cause of Mr. Aramyan's death. Both Dr. Bleifer and Dr. Hoh opined that Dr. Pakdaman would not have done anything differently had the omitted information been available to him. Dr. Noble, by contrast, opined, to a reasonable medical probability, that the failure to include the information in Mr. Aramyan's chart delayed his surgery. The basis for Dr. Noble's opinion was unclear. Dr. Noble conceded that the authorization would simply have told Dr. Pakdaman that the surgery had been approved, and thus would not have provided any information beyond that which the Aramyans gave Dr. Pakdaman on January 18.[238] Similarly, while Dr. Hoh's email would have indicated that Dr. Yokoyama contemplated

_____

[238]Dr. Noble asserted that it would have been important for Dr. Pakdaman to see the authorization given Dr. Pakdaman's deposition testimony that had he "known that [the surgery had already been authorized], . . . [he would not] have [had] any reason to see Mr. Aramyan." (See, e.g., *id.* at 231.) Dr. Pakdaman, however, clarified this testimony at trial. He explained that he had been confused during his deposition, and that he saw Mr. Aramyan at APHV on January 18 not for clearance purposes, but for a pre-operative evaluation. (*Id.* at 298-301.) Dr. Pakdaman's trial testimony is consistent with, and corroborated by, his contemporaneous notes of the January 18, 2006 visit. These state that Mr. Aramyan was "here for pre-op evaluation for CABG." (Exh. 40, Section G at 12.)

41

surgery on January 19, the Aramyans told Dr. Pakdaman this fact. Dr. Noble also stated that the EKG that Dr. Pakdaman took was sufficient to indicate that surgery was appropriate for Mr. Aramyan. He testified, however, that Mr. Aramyan's medical records, including the December 18 EKG, would have helped Dr. Pakdaman appreciate the "urgency" and "severity" of Mr. Aramyan's condition.[239] Dr. Noble did not specify how an increased understanding of the urgency and severity of the situation would have changed Dr. Pakdaman's actions, nor did he testify that, had Dr. Pakdaman had access to the additional information, he would have sent Mr. Aramyan to the emergency room for immediate surgery.[240] Rather, Dr. Noble testified that in his opinion Mr. Aramyan's condition was urgent but not emergent on January 18, meaning that it did not require immediate hospitalization. He further opined that Dr. Pakdaman did not "breach[ ] the standard of care in his care and treatment of Mr. Aramyan. Consequently, although the inadequate charting was a breach of the standard of care, it was not the proximate cause of Mr. Aramyan's death.

13. Indeed, the court has found that Dr. Yokoyama's office had already decided to postpone the surgery by the time Dr. Pakdaman saw Mr. Aramyan on January 18. Mrs. Aramyan testified that Mrs. Yokoyama told her the surgery had been postponed during the same telephone call in which Mrs. Yokoyama told her to accept the January 18 appointment at APHV. Similarly, Mrs. Yokoyama told Ms. Towner at midday on January 18 that the

---

[239]*Id.* at 236.

[240]Although Dr. Noble stated that differences between the December and January EKGs would have apprised Dr. Pakdaman of changes in Mr. Aramyan's condition (*id.* at 238), he also testified that Dr. Pakdaman could have determined, based on the January 18 EKG alone, that Mr. Aramyan was "moving toward a heart attack" (*id.* at 245). Dr. Noble also stated that, based on the January 18 EKG alone, Dr. Pakdaman could have determined that Mr. Aramyan was going to have a heart attack in the near future. (See *id.* at 246-47.) (Although the court struck the witness' reference to "a 24-hour window," it noted that Dr. Noble had consistently testified that Mr. Aramyan's condition was urgent. (*Id.* at 265-66.)) While certain of these opinions were contradicted by Dr. Bleifer, the court cannot find that APHV's failure to prepare a proper chart caused Mr. Aramyan's death even accepting Dr. Noble's opinions as true.

1   surgery had been rescheduled for the following week.

2   14.   For theses reasons, although the court finds that APHV staff breached their duty of care

3         to Mr. Aramyan, plaintiffs have not demonstrated that this breach was the proximate cause

4         of Mr. Aramyan's death.

5         **D.   Whether Dr. Hoh Is Liable for Malpractice For Requiring That Mr. Aramyan**

6              **Be Seen at APHV and By a Cardiologist**

7   15.   The second breach of the standard of care identified by Dr. Noble was Dr. Hoh's

8         "insist[ence] that Mr. Aramyan see a primary care physician" after Dr. Hoh's January 16,

9         2006 conversation with Mrs. Yokoyama.[241]   According to Dr. Noble, this appointment

10        "didn't even need to occur," and Dr. Hoh breached the standard of care by requiring it.[242]

11  16.   Defendant contends that Dr. Hoh did not owe a duty of care to Mr. Aramyan on January

12        16 because a physician-patient relationship had not been established at that time.   One

13        California court has suggested, however, that a physician who voluntarily undertakes to

14        be on call may be deemed to have established a physician-patient relationship with all

15        patients who might seek his aid as on call physician, giving rise to a duty of care.   See

16        *Hudson*, 2003 WL 1154188 at *3.   Here, Dr. Hoh was on call on January 16, and Mrs.

17        Yokoyama sought his aid on behalf of Mr. Aramyan, an APHV patient.

18  17.   Ultimately, the court need not decide whether Dr. Hoh assumed a duty toward Mr.

19        Aramyan on January 16; assuming Dr. Hoh owed Mr. Aramyan a duty of care on that

20        date, plaintiffs have not established by a preponderance of the evidence that Dr. Hoh's

21        actions on January 16, 2006 breached the standard of care.

22  18.   Dr. Noble's opinion that Dr. Hoh breached the standard of care was based on his

23        interpretation of the facts.   Essentially, Dr. Noble testified that Dr. Hoh prevented the

24        surgery from going forward by requiring additional unnecessary hurdles to be cleared

25

26   _____

27   [241]*Id.* at 248.

28   [242]*Id.*

43

before the surgery could occur because he had financial incentives to do so.[243] The surgery

had already been approved, however, and there was no credible evidence that Dr. Hoh said

Dr. Yokoyama could not go forward on January 19.[244] Mrs. Yokoyama contacted Dr. Hoh

on January 16, and requested that he assist in obtaining a cardiology referral for Mr.

Aramyan. While there was a substantial dispute regarding the nature of the services for

which that referral was sought, Mrs. Yokoyama clearly sought a cardiology referral from

APHV.[245] Whether this referral was for preoperative, intra-operative, or post-operative

---

[243]*Id.*

[244]Dr. Hoh's testimony suggested that he at least envisioned a possibility that the cardiologist to whom he referred Mr. Aramyan might conclude that surgery was not required. (See, e.g., *id.* at 428 (agreeing that he expected the cardiologist to "take an independent view of the patient's history and make an independent assessment of what was best for that patient"); *id.* at 249 ("Q. And on the 16th of January, when you created this note, was it your hope that that cardiologist would recommend a nonsurgical remedy for this problem? A. Not at all. I was not debating that. I did not know the patient, but I assumed that the cardiologist would be needed if the patient needed surgery. Now, if the patient did not need surgery, then the cardiologist would also be very helpful because then he would optimize the patient's care medically. Either way, a cardiologist is important in this kind of situation. Q. Did you think that the cardiologist would recommend the CABG procedure? A. It would not be that much up to me, but on the other hand, I was assuming at this point that the patient might need to have a CABG, and I was trying to help him get the best care possible"); *id.* at 429-30 ("Q. You wanted the patient to have a cardiologist consult prior to the surgery; correct? A. Ideally, yes. Q. That consult is for the cardiologist to look at the patient and to form his or her own assessment of this patient's best needs. True? A. True. Q. That is a brand new appointment, where a physician is charged with a duty of looking at this patient as an independent problem that can be addressed as that physician sees fit. True? A. True"). A fair reading of Dr. Hoh's overall testimony, however, is that he presumed surgery was going to be necessary, and that a cardiologist was required to be available intra-operatively and to follow the patient post-operatively. See *id.* at 430 ("Q. Did you know that five different physicians in 2005 told this patient that he should have CABG surgery? A. Doesn't matter how many. He still needed to have a cardiologist who could follow him at St. Vincent's, and Rita actually asked for that"); *id.* at 431-32 ("Q. Was it your view that Dr. Yokoyama needed a fifth cardiologist to tell him that this patient needed a CABG procedure? A. No. He needed a cardiologist who could see the patient at St. Vincent's Hospital and continue his care potentially in surgery and also see after surgery. He could not use the cardiologist who had seen him at Glendale").

[245]The dispute concerns whether the referral was for cardiology services peri-operatively (before, during and after surgery) or only intra- and post-operatively (during and after surgery).

care, Dr. Hoh testified that the policies of the IPA required that APHV see Mr. Aramyan before providing the referral.  Unless Mr. Aramyan's situation was emergent, Dr. Hoh could not bypass the requirement that Mr. Aramyan be seen at APHV before providing a referral to a cardiologist.  All of the physicians who testified agreed that Mr. Aramyan's condition was not emergent on January 16-18, 2006.  The court thus credits Dr. Bleifer's testimony that Dr. Hoh's actions in response to Mrs. Yokoyama's January 16 call were appropriate and within the standard of care.  January 16 was the first time Dr. Hoh was informed of Mr. Aramyan's need for surgery and a cardiology referral, and he immediately took steps to arrange for an appointment and referral.  Considering the time frame Dr. Hoh was given to arrange these matters, he acted appropriately.  Accordingly, the court concludes that, under the circumstances, Dr. Hoh's response to Mrs. Yokoyama's January 16 phone call did not breach the standard of care.

### E.   Whether APHV is Liable for Malpractice Based on Its Response to Receipt of the Authorization for Surgery

19.  At closing, plaintiffs' counsel argued that there was an additional breach in addition to the two identified by Dr. Noble.  Counsel argued that APHV should have had policies in place to trigger an inquiry following receipt of an authorization for a potentially life-saving procedure.[246]  He asserted that, once APHV received the authorization for the CABG surgery, it should have realized that its involvement might be necessary for the surgery to go forward, and APHV staff should have contacted the Aramyans or Dr. Yokoyama's office to gain a better understanding of the situation.  In the court's view, this is plaintiffs' strongest argument.  As explained above, when the breach concerning creation of the chart occurred, the surgery had already been postponed; short of an emergency situation, Dr. Pakdaman would not have directed Mr. Aramyan to undergo surgery immediately.  Similarly, when Dr. Hoh was first informed of Mr. Aramyan's need for surgery on January 16, he had only limited time to arrange for the necessary cardiology referral

[246]*Id.* at 516.

45

1    consistent with the IPA's policies.  Thus, the only conduct by APHV that arguably could

2    be said to have delayed the surgery was its inaction prior to January 16.

3  20.  Defendant counters that the court cannot consider APHV's response to receipt of the

4    authorization because plaintiffs did not proffer expert testimony that the response breached

5    the standard of care.  The only expert testimony regarding APHV's response to receipt of

6    the authorization was that of Dr. Bleifer, who testified that APHV's actions were

7    appropriate and within the standard of care.

8  21.  Despite this fact, the court concludes that it can consider whether defendant is liable due

9    to APHV's response to receipt of the authorization without expert testimony.  The need

10    for expert testimony to establish the standard of care is based on the premise that the

11    propriety of a particular response to a medical situation is generally outside the knowledge

12    of laypersons.  See *Flowers*, 8 Cal. 4th at 1001.  Thus, California courts have typically

13    required expert testimony to establish the standard of care applicable to non-physician

14    medical staff and medical institutions as well as doctors.  See, e.g., *Hockett v. Bakersfield*

15    *Family Medical Center*, No. F054340, 2009 WL 2171028, *8 (Cal. App. July 22, 2009)

16    ("[W]e conceive of three other hypothetical theories for finding BFMC liable: (1) that the

17    negligent employee was BFMC's physician's assistant, Ramona Dolan; (2) that the

18    negligent employee was the BFMC case manager who selected Emmanuel as the particular

19    skilled nursing facility; or (3) that Emmanuel was the agent of BFMC.  The fatal

20    evidentiary problem with the first two theories is that there was no testimony that either

21    of these individuals' conduct fell below the standard of care or caused decedent's death");

22    *Wilson v. Spring Hill Manor Convalescent Hosp.*, No. C053244, 2007 WL 1653181, *2

23    (Cal. App. June 8, 2007) (rejecting plaintiff's argument "that there was no expert

24    testimony requirement because his 'lawsuit is against a business,' not a nurse or doctor");

25    *Hakeem v. West Anaheim Medical Center*, No. G037313, 2007 WL 1181021, *1 (Cal.

26    App. Apr. 23, 2007) (requiring "expert testimony as to the standard of care of the nursing

27    staff); *Delarroz v. CHW/Marion Medical Center*, No. B171658, 2005 WL 2715860, *19

28    (Cal. App. Oct. 24, 2005) ("Dr. Rand-Luby declared that she was familiar with the

standard of care for nurses and hospitals, based on her regular interaction with the nursing staff of hospitals like Medical Center and her treatment of patients with complications similar to Melody's. Dr. Rand-Luby's declaration established the necessary foundation to provide expert testimony on the standard of care for hospital staff, as well as any breach by the Medical Center").

22. Here, however, the alleged breach regarding receipt of the authorization was essentially administrative in nature. That is, the breach consisted of the failure to implement procedures to ensure that the document was given to someone who could appreciate its potential significance and respond appropriately. Although the California Supreme Court has stated that the "common knowledge" exception to the expert testimony requirement generally applies to situations involving the doctrine of res ipsa loquitur, see *Flowers*, 8 Cal. 4th at 1001, it has not strictly limited use of the exception to such situations. Conceivably, appropriate administrative procedures are within the common knowledge of a lay factfinder. Although the court has not encountered a California case expressing this concept, numerous courts in other states have held that "[t]he standard of nonmedical, administrative, ministerial, or routine care in a hospital need not established by expert testimony because the jury is competent from its own experience to determine and apply such a reasonable-care standard." See *Snyder v. Injured Patients and Families Compensation Fund*, 768 N.W.2d 271, 275 (Wis. App. 2009); see also, e.g., *Mills v. Angel*, 995 S.W.2d 262, 268 (Tex. App. 1999); *McGraw v. St. Joseph's Hosp.*, 488 S.E.2d 389, 396 (W. Va. 1997); *Landes v. Women's Christian Ass'n*, 504 N.W.2d 139, 141 (Iowa App. 1993). While these cases frame the rule in terms of administrative activities by hospitals, the court sees no reason why the same principle should not apply to a clinic such as APHV.

23. Further, this approach is consistent with the California Supreme Court's statements that "professional negligence," such as medical malpractice, does not differ fundamentally from ordinary negligence. In *Flowers*, the Court explained: "'[N]egligence is conduct which falls below the standard established by law for the protection of others against

47

unreasonable risk of harm.' Thus, as a general proposition one 'is required to exercise the care that a person of ordinary prudence would exercise under the circumstances.'"  8 Cal.4th at 997 (quoting RESTATEMENT 2D TORTS § 282 (alteration original)).  "Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances."  *Id.* (citations omitted).  These same principles apply whether an action is styled one for "ordinary negligence" or "professional negligence."  *Id.* at 997-98.  The only distinction between professional negligence and ordinary negligence is that the professional's specialized knowledge and skill are part of the relevant circumstances considered in determining the applicable standard of due care:

> "With respect to professionals, their specialized education and training do not serve to impose an increased duty of care but rather are considered additional 'circumstances' relevant to an overall assessment of what  constitutes 'ordinary prudence' in a particular situation. Thus, the standard for professionals is articulated in terms of exercising 'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing.'"  *Id.*
> (quoting Prosser & Keeton, TORTS § 32 at 187 (5th ed. 1984)).

This explanation of the relationship between the standard of care in professional negligence cases and ordinary negligence cases suggests that the common knowledge exception to the expert testimony requirement is not limited to res ipsa loquitur situations; rather, expert testimony is only required where a tortfeasor's professional knowledge and skill affect the applicable standard of care.  To the extent, therefore, that evaluation of APHV's response to receipt of the authorization is simply a matter of proper administrative procedures, the court need not rely on expert testimony to determine whether a breach of the standard of care occurred.

24.    Putting aside whether APHV owed Mr. Aramyan a duty of care at the time it received the

authorization, the court finds that plaintiffs have not carried their burden of establishing that APHV's response breached the standard of care.  This is because the court cannot that conclude that APHV had reason to believe that it needed to take action to facilitate Mr. Aramyan's surgery on January 9, when it received the authorization.  As explained, the court does not credit Mrs. Yokoyama's testimony that she called APHV in early January to attempt to arrange an appointment.  The clinic thus had no information regarding Mr. Aramyan when it received the authorization.   The only information provided in the authorization was the fact that the surgery had been approved.  As approval had been given without APHV's involvement – contrary to the IPA's normal policies –  there was no reason for APHV physicians and staff to believe that their further involvement was required.  The authorization did not indicate that Mr. Aramyan needed a further referral for a cardiologist.

25.    Further, although the court has concluded that plaintiffs need not present expert testimony on this issue, Dr. Bleifer's expert testimony that APHV's conduct was appropriate weighs against a finding of breach.  The clinic took steps to ensure that both the patient and the doctor who was scheduled to perform the surgery received the authorization.  It also contacted the patient and asked him to come in for an appointment.  This request was declined.  Under the circumstances, it was reasonable for APHV staff to conclude that the parties responsible for securing the authorization for the surgery would address any further requirements for the surgery to proceed without its involvement.

26.     Accordingly the court finds that APHV's response to receipt of the authorization did not breach the standard of care.

27.    Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

1

2                              **III.  CONCLUSION**

3         For the reasons stated, the court concludes that plaintiffs have not carried their burden of

4  establishing that defendant is liable for medical malpractice.

5

6  DATED: February 8, 2010

7                                            MARGARET M. MORROW
                                             UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28